UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN RACING, LLC,

Plaintiff,

v.

PAUL GENTILOZZI et al.,

Defendants.

_____/

Case No. 1:12-CV-488

HON. ROBERT HOLMES BELL

# O P I N I O N

This matter is before the Court following a five-day bench trial that began on December 5, 2016. The Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. Background

Plaintiff Ryan Racing, LLC, is an entity owned by professional race car driver Ryan Hunter-Reay. Defendants Rocketsports, Inc. ("Rocketsports"), RSR Racing, LLC ("RSR"), Gentilozzi Real Estate and Management Company, Inc. ("GRE"), Victor Development II, LLC ("Victor II"), Atrium Partners ("Atrium"), Westland Center Partners ("WCP"), 320 North Washington Square Partnership ("320 North Washington Square"), and 3400 West Road, LLC ("3400 West Road") are entities owned, in whole or part, by Defendant Paul

Gentilozzi.[1] Rocketsports and RSR were engaged in the business of motorsports. Gentilozzi's other entities owned or were involved in the business of real estate.

Rocketsports is an S corporation formed by Gentilozzi in 1991. Gentilozzi was and is the sole owner of Rocketsports. From 1985 to 2009, Gentilozzi and Rocketsports raced cars associated with several manufacturers, including Ford, Oldsmobile, Chevrolet, and Jaguar. In 2005, Plaintiff and R&R Racing Enterprises LLC ("R&R") entered into an agreement with Rocketsports whereby Hunter-Reay would provide driving services for Rocketsports throughout the 2005 season of the Champ Car World Series. Partway through the season, Gentilozzi prematurely terminated the contract on behalf of Rocketsports. In an email to Hunter-Reay, Gentilozzi claimed that the racing season had been a disappointment, but he accepted responsibility for Rocketsports' inability to provide a car that Hunter-Reay needed "to achieve [his] potential." (JX 194.)[2] In October 2005, R&R notified Rocketsports that it had breached the contract by terminating it prior to the end of the racing season and by harming Hunter-Reay's reputation. (PX 6.) R&R also notified Rocketsports that the damages resulting from the breach were expected to be in the "millions of dollars[.]" (*Id.*) Gentilozzi's attorneys responded with a letter accusing Hunter-Reay of breaching the contract and falsely claiming that he caused $1.2 million in crash damages. (JX 195.) In July

---

[1]Gentilozzi holds a 60% interest in RSR, a 100% interest in GRE, a 99.9% interest in Atrium, a 100% interest in WCP, a majority stake in 320 North Washington Square, and a 60% interest in 3400 West Road.

[2]The Court will refer to Plaintiff's exhibits as "PX [number]," Defendants' exhibits as "DX [number]," and joint exhibits as "JX [number]."

2008, Plaintiff filed a demand for arbitration against Rocketsports based on the asserted breaches of the contract, claiming losses of over $3.5 million. (PX 1.) In August 2009, the arbitrator found in favor of Plaintiff and issued an award for approximately $2.7 million. The Ingham County Circuit Court confirmed the award in a judgment issued in September 2009. Thus far, Plaintiff has collected approximately $230 of that judgment.

In April 2009, while the arbitration proceedings were still ongoing, Gentilozzi formed a new corporate entity for his racing business, RSR. Gentilozzi is the majority owner and manager of RSR. Plaintiff submitted its closing brief to the arbitrator on or about July 17, 2009. (PX 3.) On July 31, 2009, eighteen days before the arbitration award issued against Rocketsports, Rocketsports transferred substantially all of its assets to RSR. According to the Asset Purchase Agreement ("APA") between Rocketsports and RSR, Rocketsports purportedly transferred $734,870 worth of assets to RSR in exchange for the assumption of $1,292,147 in liabilities. Thereafter, Rocketsports effectively ceased operations. Because Plaintiff was unable to recover any significant portion of the judgment from Rocketsports, Plaintiff filed this action in 2012 to collect on the judgment from Gentilozzi, RSR, and the other Defendants, Gentilozzi's real estate entities. Plaintiff asserts four claims in its complaint: (1) fraudulent transfer under the Michigan Uniform Fraudulent Transfer Act ("UFTA"), Mich. Comp. Laws § 566.31; (2) conspiracy to commit a fraudulent conveyance; (3) successor liability against RSR; and (4) piercing the corporate veil of Rocketsports against Gentilozzi.

## II. Piercing the Corporate Veil

In Count 4 of the complaint, Plaintiff seeks to recover on its judgment against Rocketsports from Gentilozzi, who was at all times the sole owner and the manager of the company. Under Michigan law,[3] there is a presumption that the corporate form will be respected. *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 761 (Mich. 1947)). This presumption, often referred to as the corporate veil, is that the entity is separate and distinct from its owner or owners. *Id.* "Courts will honor this presumption even when a single individual owns and operates the entity." *Green v. Ziegelman*, 873 N.W.2d 794, 803 (Mich. Ct. App. 2015) ("*Green II*"). However, "[c]omplete identity of interest between [the] sole shareholder and corporation may lead courts to treat them as one for certain purposes." *Kline v. Kline*, 305 N.W.2d 297, 298 (Mich. Ct. App. 1981). Generally, the corporate veil "may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Seasword,* 537 N.W.2d at 224 (alteration in original) (quoting *Wells v. Firestone Tire & Rubber Co.*, 364 N.W.2d 670, 674 (Mich. 1984)). "'[T]he fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts.'" *Green II*, 873 N.W.2d at 803 (quoting *Wells*, 364 N.W.2d at 673); *see also Kline*, 305 N.W.2d at 299 ("A court's treatment of a

---

[3]This is a diversity action. The parties agree that Michigan law applies.

4

corporate entity clearly rests on notions of equity, whether it is an action at law or at equity.").

Generally, Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996) (citing *SCD Chem. Distribs., Inc. v. Medley*, 512 N.W.2d 86, 90 (Mich. Ct. App. 1994)); *see also Gledhill v. Fisher & Co.*, 262 N.W. 371, 372 (Mich. 1935). However, "there is no mechanical test for determining when the existence of a separate entity must be disregarded . . . whether to disregard the separate existence of an entity depends on the totality of circumstances." *Green II*, 873 N.W.2d at 807. "Each case involving disregard of the corporate entity rests on its own special facts." *Kline*, 305 N.W.2d at 299.

As this Court recognized in a prior opinion in this case, a veil-piercing claim "is not by itself a cause of action." *In re RCS Eng'd Prods. Co., Inc.*, 102 F.3d 223 (6th Cir. 1996). Rather, it is "an equitable remedy sparingly invoked to cure certain injustices that would otherwise go unredressed in situations 'where the corporate entity has been used to avoid legal obligations.'" *Gallagher v. Persha*, Nos. 325471, 327840, 2016 WL 3199073 (Mich. Ct. App. June 9, 2016) (quoting *Wells*, 364 N.W.2d at 674). In a prior opinion, this Court examined whether Plaintiff could pierce the corporate veil against Gentilozzi to collect on a judgment entered against Rocketsports, even though Gentilozzi was not a party to the proceedings in which the judgment was entered. This Court noted the decision in *Green v.*

5

*Ziegelman*, 767 N.W.2d 660 (Mich. Ct. App. 2009) ("*Green I*"), in which the Michigan Court of Appeals held that post-judgment supplementary proceedings under Mich. Comp. Laws § 600.6104(5) and Rule 2.621 of the Michigan Court Rules could not be used to pierce the corporate veil and enforce a judgment against a third party. *Id.* at 668. However, this Court distinguished *Green I* because Plaintiff asserted *new* claims against Gentilozzi in Counts 1 and 2 (fraudulent transfer and conspiracy to commit fraudulent conveyance) that were not required to have been brought in the state-court action. (2/19/2015 Op. 8-9, ECF No. 162.) Thus, Plaintiff could seek to pierce to corporate veil of Rocketsports and reach the assets of Gentilozzi as a remedy for the claims asserted in Counts 1 and 2. The Court subsequently held that, because Plaintiff had not shown that it was entitled to summary judgment on its fraudulent-transfer claims, it was not entitled to summary judgment on its veil-piercing claim. (*Id.* at 34.)

Plaintiff's pre-trial brief, and Defendants' pre-trial and post-trial briefs, apparently assume that Plaintiff must succeed on its fraudulent-transfer claims in order to pierce the corporate veil of Rocketsports. That is not the case. After this Court issued its opinion in February 2015, the Michigan Court of Appeals clarified that a plaintiff could bring a new action against a shareholder under a theory of piercing the corporate veil "in an attempt to enforce [a] judgment" entered against the corporation. *Gallagher*, 2016 WL 3199073. "[T]he concern that there be a separate cause of action to support this type of equitable relief does not arise when . . . there already exists a judgment based on one or more causes of action." *Id.* "As a result, when a judgment already exists against a corporate entity, an additional

6

cause of action is not needed to impose liability against a shareholder or officer if a court finds the necessary facts to pierce the corporate veil." *Id.* In this case, Plaintiff seeks to pierce the corporate veil as a remedy for its breach-of-contract claim against Rocketsports. Thus, as long as Plaintiff can establish the necessary facts to pierce the corporate veil with regard to this claim, it can seek equitable relief against Gentilozzi without relying upon its fraud claims in Counts 1 and 2 for the underlying cause of action.

Applying the three-part test in *Foodland*, *supra*, the Court concludes that Plaintiff can pierce the corporate veil of Rocketsports to reach the assets of Gentilozzi, because (1) Rocketsports was a mere instrumentality of Gentilozzi, (2) Gentilozzi used Rocketsports to commit a wrong against Plaintiff, and (3) Plaintiff suffered an unjust loss.

### A. Rocketsports was a mere instrumentality of Gentilozzi

"[W]hen considering whether to disregard the separate existence of an artificial entity, a court must first examine the totality of the evidence surrounding the owner's use of an artificial entity and, in particular, the manner in which the entity was employed in the matter at issue." *Green II*, 873 N.W.2d at 807. To show that one entity is the "mere instrumentality" of another, courts look to these factors:

> (1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham.

*Glenn v. TPI Petroleum, Inc.*, 854 N.W.2d 509, 520 (Mich. Ct. App. 2014); *accord Laborers' Pension Trust Fund v. Sid Weinberger Homes, Inc.*, 872 F.2d 702, 704-05 (6th Cir. 1988).

Michigan courts have also considered the commingling of funds and the extent to which the shareholder controlled the decisions of the entity. *See Foodland Distribs.*, 559 N.W.2d at 381; *Herman*, 26 N.W.2d at 763 (parent company's "domination and control" over its subsidiaries was "so complete" that the subsidiaries were instrumentalities of the parent).

(1) Control

Gentilozzi dominated the decisions of Rocketsports. He was its sole shareholder and the manager of the business, with the final authority over all decisions. (Van Kemp Dep. 30.) He was also the most significant source of its funding. By the end of 2005, the year that Rocketsports entered into the contract with Plaintiff, its loan debt to Gentilozzi was over $6 million dollars, far exceeding the value of its assets and any other debt that Rocketsports owed. (JX 134.) By the end of 2009, its debt to Gentilozzi was over $9 million dollars. (*Id.*)

Bethany Whitford worked in the accounting department for GRE, which kept track of Rocketsports' books, as well as the books for Gentilozzi's real estate entities. She testified that at the end of each month, Gentilozzi would determine which of Rocketsports' bills it would pay. If Rocketsports needed funds, it would obtain a loan from Gentilozzi or one of his other entities, depending on where funds were available. From 2005 through 2009, there were approximately 500 loan transactions between Rocketsports, Gentilozzi, and Gentilozzi's real estate entities. (JX 142.) Gentilozzi alone determined when Rocketsports would borrow money, which entity it would borrow from, and when it would repay those loans. Gentilozzi and virtually all of his real estate businesses loaned money to, and received payments from, Rocketsports. (*See* JX 109.) Sometimes the loans were issued and repaid on the same day.

8

Gentilozzi viewed all of this money as his own, and the loans to Rocketsports as loans to himself.  This factor weighs in favor of piercing the corporate veil.

(2) Corporate formalities

One promissory note for $10,000, signed in 1991, covered all of the loans to Rocketsports from Gentilozzi. The note required monthly payments of not less than $100.00 at a rate of 3% interest, but the terms of the note were not followed and no amendments to the note were ever made. The transfers of money to and from Gentilozzi's real estate entities were tracked on the general ledgers of Rocketsports and the respective real estate entities, each of which maintained separate books, but the loans were not subject to any formal terms or conditions. No evidence was presented of any meeting minutes, corporate resolutions, business plans, or cash-flow projections for the company. This factor also weighs in favor of piercing the corporate veil. *See Woodridge Hills Ass'n v. Williams*, No. 310940, 2013 WL 5762990, at *2 (Mich. Ct. App. Oct. 24, 2013) (absence of formal loan documentation together with practice of loaning money and taking repayment whenever desired "shows a general disregard for corporate formalities").

(3) Commingling of funds and resources

As indicated above, Gentilozzi frequently transferred money back and forth between Rocketsports and other entities that he owned. Gentilozzi also frequently used the same credit cards to pay his own personal expenses as well as the business expenses of Rocketsports, and Rocketsports paid the credit card bill. Consequently, Rocketsports paid for many of his personal expenses, including gambling debts, gifts, and extravagant travel and lodging

9

expenses. Typically, when Rocketsports paid for Gentilozzi's personal expenses, he would have the accounting department treat those payments as reducing Rocketsports' loan from Gentilozzi. (Gentilozzi Aff., JX 121.) At other times, he would pay Rocketsports' bills personally, and would direct that his payment be added to his personal loan to the business. (*Id.*) But ultimately, Gentilozzi made the final decision as to whether expenses were treated as business-related or personal.

On some occasions, Rocketsports received nothing in return for its payment of Gentilozzi's expenses. Among the expenses paid by Rocketsports were thousands of dollars' worth of travel and entertainment expenses benefitting Gentilozzi and his acquaintances, including: airline tickets, restaurant bills, and hotel expenses. For instance, when Rocketsports employees traveled to attend a race, Rocketsports paid the airfare for Gentilozzi's wife, Debra Gentilozzi, to attend the event. Rocketsports also gave her a "per diem," even though she was not a Rocketsports employee. Although Gentilozzi claimed that she worked with others at Rocketsports to provide hospitality for team sponsors, she was not assigned a particular role at these events; she would simply mingle with guests and occasionally assist a sponsor. (Van Kemp Dep. 26, 97; Howard Dep. 20; D. Gentilozzi Dep. 21.)

Rocketsports also paid for travel and lodging expenses for a number of other women not associated with the company, including Melissa Reding, Tara Graeber (or "Terra Graebner"), and Tina Cochran. (*See* JX 211-213.) Rocketsports paid for Reding's travel to and from Canada, Mexico, Italy, Ireland, California, Detroit, Houston, and Las Vegas. (*Id.*)

Reding traveled with Gentilozzi and stayed with him in his hotel room; she never attended any business-related events. (Reding Dep. 26, 31.) As Gentilozzi acknowledged, it was not proper for Rocketsports to pay for her travel expenses, or for the travel expenses of Cochran, which Gentilozzi paid as a personal favor to the owner of a casino. Gentilozzi claimed that he did not know Graeber/Graebner because "everybody" used his credit card. The total amount of Gentilozzi's personal charges paid by Rocketsports without receiving any benefit in return is unclear, as Plaintiff did not provide an exact estimate. The total amount for personal airfare expenses improperly charged to Rocketsports is probably less than $30,000, though it is more likely than not that additional personal expenses were paid for by Rocketsports other than airfare. Improper expenses for airfare can be readily identified according to the names on the plane tickets, which appear on the credit card bills paid by Rocketsports. Other expenses are not so easily identified, including charges for lodging, which Gentilozzi frequently charged to his business credit card and approved as either personal or business expenses without documenting the basis for one or the other. Relative to Rocketsports' other expenditures, however, the amount of personal expenses paid by Rocketsports without receiving consideration in return is small. For instance, in June 2005 Rocketsports spent approximately $60,000 on travel and lodging expenses for that month alone. (JX 209.) Plaintiff's expert identified approximately $200,000 of what appeared to be personal charges paid by Rocketsports on several business credit cards, though almost all of these charges were properly booked as repayments of Rocketsports' loan from Gentilozzi. This factors weighs only slightly in favor of piercing the corporate veil.

11

### (4) Use of Rocketsports resources for personal benefit

In addition to having Rocketsports pay for a portion of his personal expenses, Gentilozzi raced for Rocketsports approximately 200 times. Unlike other drivers who used Rocketsports' services, he never paid the company for this privilege. It was not unusual for drivers to pay Rocketsports up to $500,000 per year for its services. Gentilozzi claimed that he gave all of his winnings to the business, but he offered no evidence of his winnings, or of adequate compensation to Rocketsports for its services.[4]

In addition, Gentilozzi used Rocketsports' assets as collateral for a mortgage on real estate that Rocketsports rented from 3400 West Road. Rocketsports was merely a tenant and paid rent to use the space. It did not own the building, it was not obligated to pay the mortgage, and it received no discernible benefit for having a lien imposed on its assets. This factor also weighs in favor of piercing the corporate veil.

### (5) Capitalization / ability to pay creditors

Rocketsports was insolvent from 2005, the year that it entered into its agreement with Plaintiff, until 2009, the year that it transferred its assets to RSR. As reflected in its balance sheets, its liabilities substantially exceeded its assets in each of those years. There is no evidence of capital contributions to Rocketsports after 1991, the year that Rocketsports was incorporated, and there were longstanding cash flow problems at Rocketsports from 2004 to

---

[4]Defendants assert in their closing briefs that Gentilozzi earned a total of $1.6 million in winnings and turned it all over to Rocketsports, but the Court is not aware of any evidence to support this assertion.

12

2009. (Glover Dep. 41.) Its monthly bank account balance was negative approximately half of that time. (Pl.'s Demonstrative Slides.) Rocketsports regularly needed loans from Gentilozzi to cover its expenses.

From 2005 to 2009, Gentilozzi and his real estate entities loaned $7,689,789 to Rocketsports, and Rocketsports transferred $5,462,283 back to them. (JX 142.) (Similarly, in 2009 and 2010, Gentilozzi and his real estate entities loaned $2,593,503 to RSR, and RSR transferred $2,577,164 back to them.) Although Rocketsports consistently failed to make a profit during this time period–it suffered losses in every year but one, and its total losses in that timeframe were approximately $3.5 million (Defs.' Demonstrative Slides)–it repaid Gentilozzi and his entities most of what was loaned. In addition, it paid over $455,000 in rent to 3400 West Road and at least $51,000 in accounting fees to GRE (Pl.'s Demonstrative Slides). Whenever Gentilozzi asked for his money back from Rocketsports, Rocketsports paid it. (Glover Dep. 81-82.) Other creditors were not as fortunate. In August 2008, Podium Sports sued Rocketsports to recover a $500,000 deposit that Rocketsports refused to return.[5] In addition, when Rocketsports ceased its business in 2009, it was left with approximately $1 million in trade payables. (Hawkins Report at 10, JX 130.) Around the time that Rocketsports transferred substantially all of its assets to RSR, it wrote approximately

---

[5]Sometime after Podium Sports filed its lawsuit against Rocketsports, RSR and Gentilozzi were added as defendants. The parties settled the matter in 2012 (JX 225) and Rocketsports entered into a consent judgment for $500,000. (*See Podium Sports CV v. Rocketsports, Inc.*, No. 1:10-cv-588 (W.D. Mich.), ECF No. 115.) As of 2009, Rocketsports did not possess the funds or assets to pay such a settlement. Gentilozzi and RSR agreed to pay up to $50,000 if Rocketsports did not make payment. (JX 225.)

$850,000 of debt off of its books. More than half of this debt was owed to Gentilozzi's real estate entities, but other portions of the debt were owed to vendors who were never paid by Rocketsports. Rocketsports should have treated the cancellation of this debt as imputed income for tax purposes, but did not do so in its tax return.

Even banks lending money to Rocketsports recognized that, financially, Rocketsports was an extension of Gentilozzi. Independent Bank loaned money to Rocketsports in 2006 and 2007. Even though Rocketsports' assets were used as collateral for the loan, the loans were also personally guaranteed by Gentilozzi. According to Cheryl Bartholic, who managed the loans, the bank was aware that Rocketsports was indebted to Gentilozzi, that Rocketsports did not make money consistently, that Gentilozzi's real estate entities were the main source of his income, and that there were many transfers of funds to and from Rocketsports and Gentilozzi's other entities. The bank was not concerned about Rocketsports' financial condition, or the transfers between Rocketsports and the other entities, because the bank relied on the personal guarantee from Gentilozzi.

Because Rocketsports consistently relied upon loans from Gentilozzi to fund its business, and because it was insolvent, it was able to pick and choose which creditors to pay. Gentilozzi could breach the contract with Plaintiff knowing that Plaintiff would have no meaningful recourse: Gentilozzi could abandon Rocketsports at any time and leave it uncollectible, which is what he did. At the same time, Gentilozzi personally benefitted from Rocketsports' losses because he used them to offset his tax liability for the income he

received from his other businesses.[6] This factor also weighs in favor of piercing the corporate veil.

(6) Separate books

GRE maintained separate books for Rocketsports and Gentilozzi's other entities, keeping an accurate record of all the loan transactions between Rocketsports and the other entities, as well as the income and expenses of each entity. This factor weighs against piercing the corporate veil.

(7) Conclusion

Considering the totality of the circumstances, especially Gentilozzi's dominance and control over the decisions of Rocketsports, Rocketsports' consistent inability to pay its obligations without funding from Gentilozzi, the lack of corporate formalities observed by Gentilozzi and Rocketsports, the repayment of loans from Gentilozzi and his entities at times when third-party vendors were not being paid, the apparent lack of a viable business plan for the company, and the use of Rocketsports' funds and resources for Gentilozzi's personal benefit, indicate that Rocketsports was a mere instrumentality of Gentilozzi. Rocketsports

---

[6]As Plaintiff's expert indicated, it was likely improper for Gentilozzi to deduct Rocketsports' losses. An individual or S corporation that conducts an activity that is not engaged in for profit (i.e., a hobby) generally cannot deduct losses attributable to that activity. 26 U.S.C. § 183(a). Rocketsports bore many attributes of a business engaged in not-for-profit activity, including: a history of sustained losses, the lack of a business plan, and activity involving personal pleasure and recreation. Gentilozzi even described the business as a hobby. He also claimed that, as to RSR, "Accomplishment is the only reward here. We don't do this for monetary reward . . . ." (JX 200.) *Cf. Sernett v. Comm'r of Internal Revenue*, No. 25295–10, 2012 WL 6012185, at *10 (T.C. Dec. 3, 2012) (finding that owner of racing business did not have an "actual, honest profit objective" and was, therefore, subject to the loss-deduction limitations in § 183).

15

was, as Gentilozzi called it, an expensive "hobby" of his. It lacked independent control over its resources and capital. It was consistently unprofitable and unable to satisfy its obligations without additional loans from him. He used it for his personal benefit and pleasure, while attempting to avoid personal liability for harm that he caused. This is an abuse of the corporate form.

### B. Gentilozzi used Rocketsports to commit a wrong against Plaintiff

Gentilozzi's actions, including his decision to cancel the contract, caused Rocketsports to breach the agreement with Plaintiff. "A breach of contract has been held to be the kind of wrong that would justify piercing a corporate veil if the corporate form had been abused." *1st State Title v. LP Recordings LLC*, No. 322964, 2015 WL 7750297, at \*5 (Mich. Ct. App. Dec. 1, 2015) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 758 (Mich. 1947); *Brown Bros. Equip. Co. v. State*, 215 N.W.2d 591, 594 (Mich. Ct. App. 1974); *see also Servo Kinetics, Inv. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 799-800 (6th Cir. 2007) (breach of contract constitutes a fraud or wrong for purposes of veil-piercing liability). By causing Rocketsports to breach the contract, Gentilozzi used it to commit a wrong. *See Green II*, 873 N.W.2d at 806 (noting that "causing an entity directly to commit a fraud or wrong would likely meet the test as originally stated in *Gledhill*").

Plaintiff also contends that Rocketsports was used to commit a fraud against it. Specifically, Plaintiff contends that Gentilozzi transferred money to his real estate entities and transferred Rocketsports' assets to RSR in order to protect Rocketsports' assets, and any revenue that it might have received under contracts with Jaguar and Yokohama, from

16

collection by Plaintiff. "[F]raud must be established by clear and convincing evidence[.]" *Foodland*, 559 N.W.2d at 381. As discussed in more detail in Section IV, *infra*, Plaintiff failed to make a showing of fraud.

Defendants argue that a veil-piercing remedy is not available in this case because Plaintiff has not demonstrated that Gentilozzi used Rocketsports to commit a fraud against Plaintiff. A veil-piercing remedy is available under the instrumentality rule where the owner's use of the corporate entity "effected a fraud *or wrong* on the complainant." *Green II*, 873 N.W.2d at 807 (emphasis added). "The [Michigan] Supreme Court, on more than one occasion, has acknowledged that the corporate veil can be pierced in the absence of fraud[.]" *Papo v. Anglo Rest. of San Jose, Inc.*, 386 N.W.2d 177, 185 n.15 (Mich Ct. App. 1986) (citing cases); *accord Foodland Distribs.*, 559 N.W.2d at 382. Thus, a showing of fraud is not necessary to pierce the corporate veil.

### C. Plaintiff suffered an unjust loss

In addition, Plaintiff's losses as a result of Rocketsports' breach of the contract constitute an unjust loss. *See Servo*, 475 F.3d at 800 (losses from breach of contract are an unjust loss); *1st State Title*, 2015 WL 7750297, at *5 (breach of contract sufficient to pierce the corporate veil). Those losses are what Plaintiff seeks to recover in this action to collect on its judgment. Thus, Gentilozzi is personally liable for the judgment against Rocketsports.

17

### III. Successor Liability

Plaintiff claims that RSR is also liable for the judgment against Rocketsports. Generally, the purchaser of a business's assets is not liable for the business's liabilities unless one of five exceptions applies:

> (1) where there is express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 509-10 (Mich. Ct. App. 1999) (citation omitted). Plaintiff relies on exceptions (3), (4), and (5). For exceptions (3) and (4), Plaintiff relies upon arguments in support of its claim that the transfer of assets from Rocketsports to RSR was fraudulent, which Plaintiff has failed to demonstrate for reasons discussed in Section IV, *infra*. Plaintiff's primary argument is that exception (5) applies because RSR is a "mere continuation" of Rocketsports.

Defendants argue that the "mere continuation" theory applies only to product-liability lawsuits and not to cases like this one, where the plaintiff is a judgment creditor. Defendants cite two unpublished cases in support of their argument, *DeWitt v. Sealtex Co., Inc.*, No. 273387, 2008 WL 2312668 (Mich. Ct. App. June 5, 2008), and *Oliver v. Perry*, No. 296871, 2011 WL 2204128 (Mich. Ct. App. June 7, 2011). This Court rejected Defendants' argument in its February 19, 2015 Opinion (ECF No. 162), citing *C.T. Charlton & Assocs., Inc. v. Thule, Inc.*, 541 F. App'x 549, 554 (6th Cir. 2013) (distinguishing the "continuity of the

18

enterprise" doctrine, which applies only to product liability cases, from the "mere continuity" exception to successor nonliability, which continues to apply in the commercial context). The Michigan Court of Appeals recently cited the *C.T. Charlton* decision approvingly. *Commonwealth Land Title Ins. Co. v. Metro Title Corp.*, – N.W.2d –, No. 324914, 2016 WL 1829634 (Mich. Ct. App. May 3, 2016). Thus, the Court finds Defendants' argument unpersuasive.

> A "prima facie" case of continuity exists where:
>
> (1) there is continuation of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations of the predecessor corporation; (2) the predecessor corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation.

*Foster*, 597 N.W.2d at 703. An additional relevant factor is whether "the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation." *Id.* at 703-04.

First, RSR maintained a continuity of management, personnel, physical location, assets, and the general business operations of Rocketsports. Gentilozzi managed the operations of RSR, as he did at Rocketsports. Unlike Rocketsports, Gentilozzi's sons were part owners of RSR, holding a 40% stake in the business. However, there is no evidence that their ownership stakes had any meaningful impact on the operation of the business. Indeed, Gentilozzi continued the same practice of loaning money to RSR from himself and his real

estate entities without formal terms or approval from others, just as he did at Rocketsports. Moreover, Gentilozzi could not name any employees that changed. Similarly, Harry "Butch" Warren, who worked at Rocketsports for many years and then worked for RSR, testified via deposition that the two businesses did "basically" the same thing, and that there was no difference from an operations standpoint. (Warren Dep. 35, 45.) The two companies also used the same office equipment, transporters, tractors, and tractor trailers. (*Id.* at 42, 44-45, 115-16.) They also worked with the same racecar drivers, Drissi and Ramoutarsingh, and used many of the same vendors. (*Id.* at 31, 34, 37.)

Gentilozzi claimed that RSR had a different business plan than Rocketsports, and was initially intended to be a joint venture with Jaguar called "R Werks," encompassing auto racing, apparel, and a museum. The joint venture did not materialize, however, and the name "R Werks" was not used. Indeed, the only significant business that arose from the relationship between Jaguar and RSR was the racing component. And although the Jaguar contract was a new one, Rocketsports had worked with Jaguar in the past, a fact that Gentilozzi promoted in his business pitch to Jaguar. (JX 214.) Indeed, when RSR finalized its agreement with Jaguar in May 2009, RSR had no capital, no salaried employees, and no meaningful assets. At a press conference to announce the Jaguar relationship shortly after RSR's formation, Gentilozzi stated that he and his team had been working on developments to the Jaguar XKR. His team included his sons, Tony and John, who worked for Rocketsports and used Rocketsports' assets to perform their work. It was not until more than two months later, at the end of July 2009, when Rocketsports transferred substantially all of its assets to

20

RSR, that RSR had the means to satisfy its obligations under the Jaguar contract. RSR even paid Rocketsports for its development work on the Jaguar vehicle.

Gentilozzi claimed that Jaguar would not work with Rocketsports, but he could not offer a plausible reason for why that would be the case. He asserted that the term "Rocket" was associated with a different car manufacturer, Oldsmobile. If that was a concern to Jaguar, however, then it would not have approved the use of the term "Rocketsports" on one of the Jaguar XKR vehicles. The agreement between RSR and Jaguar expressly allows RSR, at Jaguar's option, to run a vehicle with the name Rocketsports on the windshield. (Jaguar Agreement, Schedule 2, JX 7.) Defendants argue that Gentilozzi formed RSR to run a racing team for an exclusive sponsor, and that Rocketsports could not have entered into the Jaguar contract because Rocketsports was sponsored by multiple entities. But the agreement with Jaguar permits RSR to obtain other sponsors. (*Id.* at ¶ 11.2.) It also permits RSR to enter into agreements with other "racing partners" in racing series outside the ALMS,[7] or to endorse other products and services as long as they are not in "direct competition" with products and services offered by Jaguar. (*Id.* at ¶ 5.2.) Indeed, RSR was also sponsored by Yokohama, which provided tires to the team in exchange for publicity. (Yokohama Agreement, JX 13.) Thus, nothing prevented Rocketsports from performing the contract with Jaguar. Accordingly, RSR satisfies the first factor, continuity of operations.

---

[7]In 2009, Rocketsports was involved in the Trans-Am Series, which is a different series than the ALMS.

Second, Rocketsports ceased its business operations in 2009, not long after transferring its assets to RSR, satisfying the second factor.

Third, RSR assumed the liabilities and obligations necessary for continued operations. For instance, RSR assumed the loans secured by Rocketsports' trailers and other assets. (Asset Purchase Agreement 2, JX 9.) It also assumed liability for Rocketsports' real and personal property taxes and for payments due to 3400 West Road to rent its space. (*Id.* at 2, Exhibit C.)

Finally, RSR held itself out as a continuation of Rocketsports. A press release issued by RSR on April 17, 2009, two days after its formation, was titled "Rocketsports enters ALMS with XKR Jaguar." (JX 206.) The release referred to RSR as "Rocketsports Racing, Inc.," and explained that it was "a new entity, formed to build and race Jaguar XKR[]s in the [American Le Mans Series (ALMS)]." (JX 206.) The press release expressly tied RSR to Rocketsports, and even used the two names interchangeably. The CEO of the ALMS is quoted as stating that he is "proud to be welcoming Paul Gentilozzi, Rocketsports and the Jaguar brand" to the ALMS. (*Id.*) The press release touted the "rich history and heritage" of RSR and Jaguar, referring to Rocketsports' relationship to Jaguar, including Gentilozzi's performance in Jaguar-branded vehicles during his time at Rocketsports, and the development of two Jaguar concept cars by Rocketsports. The press release also referred to a Jaguar speed trial conducted by "RSR" in 2008, though that event was conducted by Rocketsports. (*Id.*) Gentilozzi authorized this release.

22

Among the other materials distributed to the press on April 17 were artistic renderings of the newly-developed Jaguar XKR vehicle. In those drawings, the term "Rocketsports" is emblazoned across the top of the windshield, and another portion of the car shows the RSR logo above the phrase "Rocketsports Racing." (JX 207.) These images were published online by several media outlets. (*Id.*) They were also used in a promotional video titled "Rocketsports Racing & Jaguar's ALMS GT2 launch video." (JX 198.) Similar versions of these drawings were included in the contract between RSR and Jaguar. (JX 7, Schedule 2.) In a video filmed on the day of the press release, Gentilozzi stated that "*We*'ve been racing Jaguars since 2000. It's been a big part of *RSR*'s culture." (JX 199.) RSR was a two-day old company at the time. Gentilozzi acknowledged that the term "we" in that statement included Rocketsports. In other words, he effectively lumped Rocketsports together with RSR. In another part of the video, Gentilozzi is seen pointing to a large display of the Jaguar XKR with the Rocketsports logo on the windshield.[8] At trial, Gentilozzi claimed that the press release and the drawings were incorrect, and that they were prepared by individuals who did not have sufficient knowledge of the new business. He offered into evidence a revised press release that he personally prepared after the press conference and then distributed on April 18, 2009. However, even the revised release referred to "Rocketsports Racing" in its text and in graphics. Gentilozzi could not identify any media outlets that published the revised release. He did not ask any outlets that published the original release to retract it.

---

[8]At trial, Gentilozzi also claimed that he was pointing out a mistake in the drawing, i.e., that it showed the term Rocketsports. This statement is not credible. In the video, he never actually points to the term Rocketsports on the vehicle. Nor does he appear to be explaining that there is a mistake. Instead, he appears to be posing for photographs.

Gentilozzi also claimed that RSR stopped using the term Rocketsports from that point forward; however, Phil Howard, a former team manager for Rocketsports, observed RSR using a tent with the name Rocketsports on the canopy. (Howard Dep. 29.) In addition, at the end of November 2009, the sign for RSR's business still read Rocketsports. (Warren Dep. 80.) Thus, RSR continued using the name Rocketsports for a significant period of time.

Even the names of the two businesses are similar. Rocketsports was often called Rocketsports Racing (Van Kemp Dep. 51), and Rocketsports was abbreviated as "RS" on Rocketsports' own internal documents. Prior to trial, Gentilozzi claimed that the "RS" in RSR was from Jaguar's logo and that he did not know what the second "R" in RSR stood for. At trial, however, his testimony changed. He acknowledged that the second R stood for racing. Consequently, RSR can be readily understood as an abbreviation for **R**ocket**S**ports **R**acing, as is suggested by the RSR logo on the promotional materials released on April 17, 2009.

In short, the factors weigh in favor of a finding that RSR is liable as a successor to Rocketsports because it is a mere continuation of that company.

## IV. Fraudulent Transfer

The Michigan Uniform Fraudulent Transfer Act (UFTA), Mich. Comp. Laws § 566.31 et seq., permits a creditor to avoid a transfer that is fraudulent, "to the extent necessary to satisfy the creditor's claim." Mich. Comp. Laws § 566.37(1)(a). A transfer of assets is fraudulent as to a creditor if the transfer is made: "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Mich. Comp. Laws § 566.34(1)(a). A transfer of assets

24

is *constructively* fraudulent if it is made without receiving "reasonably equivalent value" and the debtor either: "engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; or "believed or reasonably should have believed that he or she would incur[] debts beyond his or her ability to pay as they became due." Mich. Comp. Laws § 566.34(1)(b). Fraud must be proven by clear and convincing evidence. *Foodland Distribs.*, 559 N.W.2d at 481. But fraudulent intent may be inferred from circumstantial evidence. *Szkrybalo v. Szkrybalo*, No. 269125, 2007 WL 1575262, at *2 (Mich. Ct. App. May 31, 2007).

The UFTA sets forth a nonexclusive list of 11 "badges of fraud" that may be considered in determining a debtor's "actual intent" in making a transfer of assets:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

25

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mich. Comp. Laws § 566.34(2). "'Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and number concurring in the same case, and may be overcome by evidence establishing the bona fides of the transaction.'" *Wells v. Salmo (In re Select One, Inc.)*, No. 12-05664, 2013 WL 4084103, at *17 (Bankr. E.D. Mich. Aug. 13, 2013) (quoting *Bentley v. Caille*, 286 N.W. 163, 164 (Mich. 1939)). "A 'concurrence of several [of these factors] will always make out a strong case' in support of fraudulent intent." *John Ceci, P.L.L.C. v. Johnson*, No. 288856, 2010 WL 1872927, at *4 (Mich. Ct. App. May 11, 2010) (quoting *Bentley*, 286 N.W. at 164).

### A. Transfers from Rocketsports and RSR to Gentilozzi and his entities

Plaintiff claims that the transfers of money from Rocketsports' National City checking account to Gentilozzi and his real estate entities from June 2006 to December 31, 2009 are fraudulent under the UFTA.[9] Plaintiff also claims that the transfers from RSR to Gentilozzi and his real estate entities are fraudulent under the UFTA.[10] Plaintiff relies on five badges of fraud: (1) transfer to insiders; (2) retention of control by the debtor after transfer;

---

[9] The total amount of these transfers is $3,447,230. (Pl.'s Demonstrative Slide 3.)

[10] The total amount of these transfers is $2,577,164. (Pl.'s Demonstrative Slide 16.)

(3) concealment of the transfer; (4) transfer after being threatened with lawsuit or after debt

incurred; and (5) transfer when the company is insolvent.

### 1. Transfer to Insiders

All of the transfers between Rocketsports and RSR to Gentilozzi and his real estate

entities were transfers to insiders. (*See* 2/19/2015 Op. 20-21, ECF No. 162.)

### 2. Control

The same person effectively retained control over the assets before and after the

transfer. Gentilozzi dominated the financial decisions of Rocketsports, RSR, and his real

estate entities. He determined when and how much money would be transferred back and

forth between these entities.

### 3. Concealment

During the arbitration proceedings, Defendants provided a check register to Plaintiff

for the period from 2004 to 2005 with 49 transactions redacted. Gentilozzi refused to comply

with the arbitrator's order to provide an unredacted register. After Stephen Afendoulis,

Plaintiff's attorney, obtained an unredacted register in supplementary proceedings, he

discovered that the majority of the redacted entries were inter-company transactions. Plaintiff

contends that this is evidence of concealment of fraudulent transfers. The Court disagrees.

The redactions occurred when Plaintiff was attempting to obtain discovery to determine the

truth of Gentilozzi and/or Rocketsports' assertions regarding the reason for the termination

of the driving agreement, i.e., whether Hunter-Reay had caused Rocketsports to pay for over

$1 million in crash repairs, as Rocketsports claimed.[11] The inter-company transactions were not relevant for that dispute; thus, it did not matter that they were redacted. Moreover, when Plaintiff attempted to determine Rocketsports' financial status in supplementary proceedings, the transactions were fully disclosed in an unredacted check register. Consequently, the transactions were not concealed.

### 4. Transfer after threat of suit or after substantial debt was incurred

All of the transfers after October 25, 2005, were made after Rocketsports received notice of a suit involving potentially millions of dollars in damages. In addition, all of the transfers made after the arbitration award issued on August 18, 2009, were made after a substantial debt was incurred.

### 5. Transfer when debtor was insolvent

Rocketsports and RSR were insolvent when the transfers were made because, at all relevant times, their liabilities exceeded their assets.

### 6. Conclusion as to actual intent

Plaintiff has demonstrated the existence of four badges of fraud (control, transfer to insiders, transfer after being threatened with suit and/or after substantial debt was incurred, and transfer while insolvent). However, other factors weigh against a finding of fraudulent intent. First, looking at all the transactions to *and* from Rocketsports and RSR, more money flowed *to* Rocketsports and RSR from Gentilozzi and his real estate entities than away from Rocketsports and RSR. It is unlikely that Gentilozzi intended to defraud his creditors by

---

[11]The unredacted register showed only $400,000 in crash damages.

putting *more* money into Rocketsports and RSR than he was taking out of them. Second, virtually all the transfers away from Rocketsports and RSR were for reasonably equivalent value. They were treated as payments toward loans that were already owed. Third, a portion of the loans were issued and repaid on the very same day; their sole purpose was to permit Rocketsports and/or RSR to have sufficient funds on a temporary basis to satisfy their immediate obligations. It is counterintuitive to treat the repayment of money loaned just a few hours earlier as a transfer intended to defraud a creditor. Fourth, the transfers between Rocketsports, RSR, Gentilozzi, and his other entities were part of a consistent pattern occurring over many years. Indeed, this pattern began before Rocketsports even entered into its contract with Plaintiff. Consequently, the third badge of fraud, which considers the timing of the transfers in relation to the threat of suit and the arbitration award, carries little weight.

Considering all the evidence, the Court concludes that Plaintiff failed to demonstrate that the transfers from Rocketsports and RSR to Gentilozzi and his real estate entities were made with the actual intent to hinder, delay, or defraud a creditor.

### 7. Conclusion as to constructive fraud

Regarding Plaintiff's claim of constructive fraud, the transfers from Rocketsports and RSR to Gentilozzi and his real estate entities were treated as repayments of loans previously made to Rocketsports and RSR. Thus, Rocketsports and RSR received reasonably equivalent value in exchange for the transfers, which defeats the claim of constructive fraud.

### B. Transfer from Rocketsports to RSR under the APA

29

Next, Plaintiff argues that the transfer of substantially all of Rocketsports' assets to RSR was fraudulent under the UFTA. This claim fails because virtually all of Rocketsports' assets were secured by bank loans to Sun Trust and Independent Bank. The UFTA does not apply to assets that are "encumbered by a valid lien." Mich. Comp. Laws § 566.31(b). Moreover, the liens held by the banks exceeded the value of Rocketsports' assets. As of July 2009, the secured debt on Rocketsports' assets was approximately $1.99 million.[12] The value of its assets was no higher than $1.7 million.[13] Thus, any transfers by Rocketsports could not have been fraudulent under the UFTA because it had almost no assets to which that statute would apply.

The only asset of Rocketsports that could have been covered by the UFTA is its checking account with National City bank. Under Michigan law, a security interest in a deposit account is not perfected unless the secured party has "control" over the account. Mich. Comp. Laws § 440.9314. A secured party has control over deposit account (1) if it is the bank with which the deposit account is maintained, or (2) if the debtor, secured party, and the bank have agreed that the bank will comply with instructions by the secured party "directing disposition of the funds in the deposit account without further consent by the debtor." Mich. Comp. Laws § 440.9104(1)(a)-(b). Rocketsports did not maintain its checking

---

[12] The bulk of this debt was owed by 3400 West Road, but Rocketsports' assets were used as collateral to secure this debt. Plaintiff did not offer any evidence of the value of the assets held by 3400 West Road. The $2 million in bank debt does not include tax liens held by the City of East Lansing and the State of Michigan totaling approximately $146,000.

[13] Plaintiff did not provide evidence of the value of Rocketsports' assets, other than their book value before depreciation.

account with any of the secured parties, and there is no evidence of an agreement with National City allowing a secured party to direct the disposition of the funds in that account. Thus, there was no perfected lien on that account. On the other hand, there is no evidence of any balance in the checking account on the date of the APA, or of any funds in that account that were transferred to RSR in connection with the APA. Indeed, Rocketsports' bank account balance was often negative, and that was the case in June and July of 2009, at the time of the APA. (Pl.'s Demonstrative Slide 14.) Consequently, there is no evidence that any funds in that account were fraudulently transferred to RSR. Therefore, Plaintiff has not proven a fraudulent transfer of assets covered by the UFTA.

Even if the assets were not encumbered by valid liens, Plaintiff has not proven a fraudulent transfer. There are several badges of fraud present in the transfer of assets from Rocketsports to RSR, including: transfer to insiders; control of assets by the debtor after the transfer; transfer while the debtor was insolvent; transfer close in time to a demand for damages and the possibility that it would incur a substantial debt as a result of the arbitration; and the transfer of substantially all assets. However, another factor is whether the debtor received "reasonably equivalent value" for the transfer. Mich. Comp. Laws § 566.34(2)(h). RSR assumed approximately $1.3 million of Rocketsports' liabilities in exchange for what it valued as $584,870 in assets, $50,000 in inventory, and $100,000 in work product. (APA, JX 9.) Plaintiff offered no evidence that RSR gave less than reasonably equivalent value for the assets it purchased. Plaintiff's expert did not value the assets purchased, and expressed no opinion about their value. Moreover, he expressed no opinion as to whether the transfer

impaired Rocketsports' ability to pay its creditors. The failure to prove that a transfer was made in exchange for less than reasonably equivalent value defeats Plaintiff's claim based on "actual intent" to defraud under Mich. Comp. Laws § 566.34(1)(a), as well as its claim of constructive fraud under Mich. Comp. Laws § 566.34(1)(b).

Plaintiff claims that the transfer permitted RSR to obtain income under contracts with Jaguar and Yokohama that could have gone to Rocketsports; however, there is no evidence that Plaintiff would have been in a better position to collect on its judgment if Rocketsports had been party to these contracts. RSR received payments totaling almost $9 million from Jaguar under that contract, but these payments were made to cover RSR's expenses in order to run a Jaguar-sponsored team in the ALMS. (Jaguar Agreement ¶ 4, JX 8.) The agreement also permitted RSR to sell Jaguar XKR vehicles built by RSR, but Plaintiff offered no evidence that RSR netted any profit from the contract. Likewise, Plaintiff offered no evidence that RSR obtained any significant value from its contract with Yokohama. The Yokohama contract allowed RSR to use Yokohama tires free of charge during races, and to receive reimbursement from Yokohama for the wear and tear costs associated with tire testing sessions. (Yokohama Agreement ¶ 4, JX 14.) There is no evidence that the value received from Jaguar or Yokohama could have had any effect on the solvency of Rocketsports or its ability to pay creditors. In short, Plaintiff failed to demonstrate a violation of the UFTA.

## V. Conspiracy

Plaintiff claims that Defendants conspired to violate the UFTA. Because Plaintiff has not shown a violation of the UFTA, however, its conspiracy claim fails.

## VI. Conclusion

Based on the foregoing, the Court will enter judgment in favor of Plaintiff against Gentilozzi and RSR under Counts 3 and 4 of the complaint (piercing the corporate veil and successor liability). The Court will enter a judgment of no cause of action as to Counts 1 and 2 of the complaint (fraudulent transfer and conspiracy to commit fraud).

Because the Court finds in favor of Plaintiff, Defendants' motion for involuntary dismissal (ECF No. 241) will be denied. In addition, the Court will deny the parties' objections to the deposition designations as moot, because the testimony that is the subject of those objections was not relied upon by the Court in its decision. Finally, the Court took under advisement an objection to testimony from Bethany Whitford about Rocketsports' general ledger transactions from 2008. This objection is denied.

An order and judgment will be entered consistent with this Opinion.


Dated: <u>January 31, 2017</u>                    <u>/s/ Robert Holmes Bell</u>
                                                ROBERT HOLMES BELL
                                                UNITED STATES DISTRICT JUDGE